.CECILE LOUISE HUSH v. ANCKER HOSPITAL
OF ST. PAUL AND OTHERS.[1]

May 27, 1955.

No. 36,542.

*Marshall F. Hurley* and *Robert E. O'Connell,* for relator.
*Eugene J. Schway,* for employee-respondent.
*R. A. Woychik,* for respondent State of Minnesota.
*Charles A. Sawyer,* City Attorney, and *Carsten L. Jacobson,*
Assistant City Attorney, for respondent Division of Public Health
of the City of Minneapolis.

KNUTSON, JUSTICE.

Certiorari to review a decision of the industrial commission affirming a referee's award, under M. S. A. 251.041, of medical care and compensation for temporary total disability resulting from tuberculosis.

Petitioner, Cecile Louise Hush, a registered graduate nurse, received her bachelor of science in public health nursing degree from

[1]Reported in 70 N. W. (2d) 850.

the University of Minnesota in December 1947. She was married shortly after graduation. On January 12, 1948, she obtained full-time employment as a nurse in the public health center which was operated jointly by the Minneapolis Department of Public Health and the Hennepin County Sanatorium Commission. She was employed there, assisting in administering tests for tuberculosis and interviewing outpatients of the tuberculosis department, until July 10, 1948. A few months later, October 31, 1948, employee gave birth to her first child. On March 26, 1949, she was employed for general nursing duties at Ancker Hospital on a part-time basis. With one exception, when she worked 14 days straight in July 1950, employee worked only two days a week, generally Saturdays and Sundays. This employment continued until September 24, 1950. She did not work during the periods from July 3 to August 28, 1949; from December 26, 1949, to January 7, 1950; and from March 11 to May 6, 1950. On September 29, 1950, employee suffered a four-and-one-half-month miscarriage. At this time a chest X ray was taken which first revealed the presence of a lesion about one-half to one centimeter in diameter on employee's right lung. On November 19, 1951, nine days after the birth of her second child, another X ray was taken. It revealed that the lesion had enlarged to two to three centimeters in diameter and cavitated. Employee was then hospitalized for pulmonary tuberculosis. A segmental resection was performed on her right lung to remove the lesion. Pathological study of the lesion after its removal revealed that it was tuberculous. Subsequent to employee's discharge from the hospital on October 14, 1952, she suffered a relapse and was rehospitalized.

On March 24, 1946, while a student nurse, employee had a negative Mantoux test. Thereafter, in November 1946, she had a Mantoux which was described as "pretty positive," indicating that she had sustained a primary tuberculosis infection. A chest X ray taken at the time of the positive Mantoux revealed no visible lesions. No visible signs of tuberculosis were found on subsequent X rays, including one taken as late as March 17, 1950, while employee was hospitalized for about a week with diagnosed virus pneumonia, until

September 29, 1950, when the first demonstrable signs of active tuberculosis were found on the X ray of that date.

Evidence of employee's tubercular contacts may be summarized as follows: The customary practice at Ancker Hospital to discover tuberculosis among incoming patients was to give chest X rays before admission to a noncontagious floor. If the X rays gave any indication of tuberculosis, the patient was sent to a tuberculosis ward, usually Contagion 4, or isolated for a determination whether he was tubercular or not. Special aseptic precautions were taken in isolation or tuberculosis wards to prevent contraction of tuberculosis by hospital personnel. Critical and maternity cases were not X-rayed prior to admission to a floor. The chest X rays usually taken on admission to the hospital were not always read immediately, especially on week ends. Some patients subsequently transferred to tuberculosis wards remained in noncontagious wards for several days before transfer. Employee testified that she knew of several patients whom she had attended who were transferred to Contagion 4 and, as far as she knew, had not returned to her floor. Occasionally patients were sent there for other diseases, but employee knew of only one such case. She admitted that it was possible that patients who had been transferred to Contagion 4 could have been readmitted to floors other than the ones on which she worked.

During the period from March 26, 1949, to about February 1950, employee worked on floor W-2, women's medicine, doing general nursing, which, she testified, brought her into "close personal contact" with the patients she attended. Some of these patients were transferred to contagion and did not return to floor W-2 while employee was working there. She testified that she knew from "lab" slips or X rays belonging to the charts of some of the patients she had attended that they had active tuberculosis. One unidentified woman patient, who employee recalled was diabetic, was transferred to Contagion 4 and did not return to the floor. Employee admitted that she did not know of her own knowledge whether this diabetic patient had tuberculosis or not. Employee also stated that she knew "on hearsay information," which was not gained from lab slips or X rays, of women who were found to be actively tubercular after

she had attended them. She was unable to identify any of these women patients by name.

From February 1950 until September 25, 1950, employee performed general nursing duties on floor E-4, men's surgery. She testified that, while she was working there, not more than four men were transferred to Contagion 4 and that all of these men were sent there for a conclusive determination of whether they were tubercular or not. As far as employee knew, none of these men were retransferred back to floor E-4. One of the four tentatively was identified as "Ole Johnson." Employer produced a hospital record of one "Ole Cornelius Johnson," who was a patient at the hospital during the period when employee was working there. The record revealed that it was determined that Johnson gave no evidence of having pulmonary tuberculosis. Employee testified to the admission to the floor of an unidentified male patient wearing a mask as a precaution against the spread of tuberculosis which he was suspected of having. A negative report was first received, but a few days later he was found to have signs of tuberculosis and was transferred to Contagion 4. Employee testified that while on floor E-4 she attended a patient in isolation for tuberculosis whom she tentatively identified as one "Pat Malone." In caring for this patient she used the type of aseptic method similar to that utilized in contagion because she had been told that Malone was tubercular. She did not recall whether she had read this information on his chart or not. Hospital records did not indicate that a Patrick Malone, an adult patient, was admitted during the period employee was working at Ancker. Employee apparently had no known tubercular contacts outside of her work.

On the basis of this testimony, two doctors as expert medical witnesses were of the opinion that employee suffered an exogenous, that is, externally caused, reinfection arising from the alleged contacts with tuberculous patients while employed at Ancker. The first of these two experts was produced by employee and was the attending physician in charge of Ancker's tuberculosis building. The second expert, who testified for one of employer's codefendants, was of the opinion that employee's 1949 pregnancy probably would have caused

her primary infection to become active then if it were to become active at all. The third expert medical witness, a doctor on the tuberculosis staff at Ancker Hospital, testified on behalf of employer and was of the opinion that the disabling tuberculosis was endogenous; *i.e.,* caused by the primary infection and not by subsequent external reinfection. His opinion apparently was based primarily upon employee's failure to produce "documentary" evidence of sufficient contact with tubercular patients. He also relied in part upon what he felt was currently a "good tuberculosis control program" at Ancker, although he did not know what that program was in 1950, and his belief that employee probably in the course of her normal duties had no opportunity to come in contact with "massive exposure," which he felt was necessary to cause reinfection.

The referee awarded employee medical care and compensation under § 251.041 against employer, Ancker Hospital. Other defendants were held not liable. The industrial commission affirmed, and the case is here for review on certiorari.

The only question presented here is whether the evidence sustains the findings of the industrial commission.

The gist of employer's contention here is that employee has failed to establish by competent evidence that her employment with employer brought her into contact with tubercular patients or material contaminated with tuberculosis. Employer relies on our recent case of Peterson v. State (Operating University Hospitals), 234 Minn. 81, 47 N. W. (2d) 760. Apparently employer takes the position that all the testimony of employee is hearsay or incompetent evidence because she cannot name the person or persons from whom she contracted tuberculosis and that, inasmuch as the opinions of the doctors are based on the assumption that she did contact such tubercular patients, such opinions must also fall since they are based on incompetent evidence.

It would be useless to set forth in more detail than we already have done the evidence upon which employee relies. While she could not name the precise person or persons suspected of having tuberculosis with whom she came into contact, she did testify at length as to several patients in the wards where she worked and who were

removed to the contagious ward in the hospital. She also testified that some of these patients never returned to the general ward in which she worked. It would be placing an almost impossible burden on a person who contracted tuberculosis while employed in a hospital to require such person to prove that she contracted the disease by contact with a precise person or persons. It should be enough when she goes as far as to show the presence of tubercular patients in the place where she worked and the necessary contact with such patients. When, coupled with such showing, doctors familiar with the disease state that in their opinion the disease was contracted while so employed, it should be sufficient under the rules which we have frequently announced so that the findings of the industrial commission should be sustained. So to hold is not contrary to Peterson v. State (Operating University Hospitals), *supra*. In that case, on much weaker evidence, we simply held that the contrary finding of nonliability was sustained by the evidence.

Petitioner is allowed $250 attorneys' fees and costs and disbursements herein.

Affirmed.